**Opinion issued July 9, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-23-00172-CR**

————————————

**CORNELIUS WATSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 230th District Court**
**Harris County, Texas**
**Trial Court Case No. 1716994**

## MEMORANDUM OPINION

A jury convicted appellant Cornelius Watson of the first-degree felony offense of murder.[1] After Watson pleaded true to the allegations in two enhancement paragraphs, the jury assessed his punishment at eighty years' confinement.

---

[1] *See* TEX. PENAL CODE § 19.02(b)(1)–(2).

In his sole issue on appeal, Watson argues that the State failed to present sufficient evidence to prove that he was guilty of murder, specifically pointing out that the State offered no DNA, fingerprint, or gunshot residue evidence. We affirm.

## Background

On September 11, 2020, Daniel Partida purchased some clothing and shoes at two stores in north Houston. He also purchased drugs. After eating and drinking at a local restaurant, he walked to a bus stop near the intersection of Interstate 45 and Crosstimbers. Partida had missed the bus, so he decided to buy more alcohol at a nearby convenience store. He continued drinking, and he also used the drugs he had purchased earlier in the day until he lost consciousness.

Around midnight on September 12, 2020, a GMC Terrain parked at the Corner Food Mart, a gas station and convenience store located at the intersection of I-45 and Crosstimbers. Several individuals got out of the Terrain, including Vincent Harris, who was involved in the underlying offense. Inside the convenience store, the Corner Food Mart had a room that housed several gambling machines. The Corner Food Mart also had multiple surveillance cameras set up inside and outside the store, although none of the cameras could record audio. Surveillance footage showed that Harris and his friends hung out at the Corner Food Mart that night, occasionally playing games on the gambling machines, for around two hours.

Partida regained consciousness around 1:00 a.m. When he woke up, he discovered that all his belongings—his newly purchased clothing and shoes, his cell phone, and his wallet—were missing. Partida walked to the Corner Food Mart and tried to enter, but Ricky Nacosta, who was holding the bags of Partida's belongings, held the door shut and would not let him inside. Outside the store, Partida confronted a group of men, including Nacosta, about the theft of his property. After some discussion, Nacosta and another man repeatedly punched and kicked Partida. Harris was not involved in this fight, although he did witness it. Defeated, Partida eventually left the convenience store without his belongings.

Several minutes after the fight, Harris opened the door to the cashier area of the convenience store and placed a handgun on a shelf beneath the cash register. He then stayed inside the store, spending time on his phone and talking with others who were playing the gambling machines.

Around twenty minutes after the fight, Cornelius Watson walked up to the Corner Food Mart and went inside. Watson immediately walked to the game room, where he started interacting with Harris and the others playing the gambling machines. Over the next half-hour, Watson, Harris, and their companions spent time in the game room, wandered through the convenience store, and walked around outside the store. Surveillance footage from inside the game room showed that, at one point, Watson took a handgun out of his pocket and briefly walked around

3

holding it. Several minutes after this, Nacosta looked through Partida's bags and showed Watson the contents. Watson did not take any of Partida's belongings, but he did turn to the cashier's booth, remove the handgun from his pocket, and place it under the counter.

Approximately ten minutes later, around 2:00 a.m., Nacosta was sitting outside the convenience store with Partida's property. Partida returned to the store and again confronted Nacosta, hoping to have his belongings returned to him this time. Instead, a second fight ensued. This time Watson witnessed the fight, and Harris joined in the attack on Partida, quickly taking over for Nacosta, who left the fight and sat near the outside wall of the store with Partida's bags. The fight ultimately moved from the parking lot of the Corner Food Mart to the median of Crosstimbers, and then to the parking lot of a Shell station across the street from the Corner Food Mart.

While Harris and Partida were fighting in the Corner Food Mart parking lot, complainant Jarmel Jarmon-Joiner,[2] who used a wheelchair, rolled down the sidewalk of Crosstimbers, away from I-45. Joiner was a regular patron of the Corner Food Mart, but he did not stop at the store on this evening, nor did he get involved

---

[2] Throughout the trial testimony, Jarmel Jarmon-Joiner was referred to as "Mr. Joiner." In this opinion, we likewise refer to him as "Joiner."

4

in the fight. After the fight moved across the street to the Shell parking lot, Joiner headed back towards the I-45 underpass.

The fight lasted several minutes. Eventually, Watson and Harris ran into the Corner Food Mart and retrieved the handguns that they had placed underneath the counter in the cashier's booth. Meanwhile, Partida had crossed Crosstimbers again and was walking towards the I-45 underpass, several feet in front of Joiner in his wheelchair. Surveillance footage showed Watson and Harris, guns in hand, walking towards the intersection of I-45 and Crosstimbers. Witnesses heard multiple gunshots,[3] and police officers later recovered fired cartridge casings from two different caliber handguns in the intersection. One of the bullets struck Joiner in the back, killing him.

After the shooting, Watson and Harris returned to the Corner Food Mart, guns visible in their hands. Watson walked back inside the store, still holding a gun. Harris climbed into the backseat of the Terrain and handed his gun to the driver, who then passed the gun to a man standing outside the vehicle. Less than a minute later, Watson left the convenience store and walked down Crosstimbers, away from I-45. Police did not recover either weapon. Several hours after the shooting, Watson

---

[3]     Witness Ingrid Ramirez was in her vehicle at the intersection of I-45 and Crosstimbers at the time of the shooting. She witnessed two men leave the fight, run to the Corner Food Mart, return to the intersection with handguns, and shoot in the direction of Partida and Joiner, but she was not able to identify either shooter.

returned to the Corner Food Mart and asked the owner of the convenience store to delete the surveillance footage from the previous evening.

A grand jury indicted both Watson and Harris for murder, but the underlying case involved only the charge against Watson. The jury charge authorized the jury to convict Watson as a principal actor or under the law of parties. The jury found Watson guilty of the offense of murder and assessed his punishment at eighty years' confinement. This appeal followed.

## Sufficiency of Evidence

In his sole issue on appeal, Watson argues that the State failed to present sufficient evidence that he was guilty of murder. Specifically, he argues that the State did not present any DNA, fingerprint, or gunshot residue evidence.

### A.    *Standard of Review*

When determining whether sufficient evidence supports a conviction, we consider the evidence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences from the evidence, a rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Edwards v. State*, 666 S.W.3d 571, 574 (Tex. Crim. App. 2023). The factfinder bears the responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Edwards*, 666 S.W.3d at 574 (quoting

6

*Jackson*, 443 U.S. at 319); *Dunham v. State*, 666 S.W.3d 477, 482 (Tex. Crim. App. 2023) (stating that factfinder is "the sole judge of the credibility and weight to be attached to the testimony of witnesses") (quotations omitted).

We may not substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *Edwards*, 666 S.W.3d at 574. When the record supports conflicting inferences from the evidence, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination. *Dunham*, 666 S.W.3d at 482 (quotations omitted).

In our review, we consider "the cumulative force of the evidence." *Edwards*, 666 S.W.3d at 574; *see Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (stating that we may not use "divide and conquer" strategy when evaluating sufficiency of evidence) (quotations omitted). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence, and circumstantial evidence alone may be sufficient to establish guilt. *Dobbs*, 434 S.W.3d at 170; *see Dunham*, 666 S.W.3d at 482 ("Direct evidence and circumstantial evidence are treated equally . . . .") (quotations omitted).

***B.***     ***Governing Law***

To secure a conviction for murder in this case, the State was required to prove beyond a reasonable doubt that Watson either (1) intentionally or knowingly caused the death of Joiner by shooting him with a deadly weapon, a firearm; or (2) intended to cause serious bodily injury and committed an act clearly dangerous to human life—shooting Joiner with a deadly weapon—that caused Joiner's death. *See* TEX. PENAL CODE § 19.02(b)(1)–(2). A person acts intentionally with respect to the result of his conduct when it is his conscious objective or desire to cause the result. *Id.* § 6.03(a); *see Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) (stating that murder is "a 'result of conduct' offense"). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. TEX. PENAL CODE § 6.03(b).

The jury charge authorized the jury to convict Watson as a principal actor or under the law of parties based on the actions of Harris. *See id.* § 7.01(a) ("A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both."); *see also Beltran v. State*, 472 S.W.3d 283, 293 (Tex. Crim. App. 2015) ("[I]f a defendant is found guilty as a party, that defendant is found to have 'caused the death' of the victim."). Under the law of parties, a person is criminally responsible for an offense committed by another if, "acting with intent to promote or assist the

8

commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE § 7.02(a)(2); *see also Metcalf v. State*, 597 S.W.3d 847, 856 (Tex. Crim. App. 2020) (stating, in case involving another subsection of section 7.02(a), that "[t]o prove the intent-to-promote-or-assist element, the State must show that it was the defendant's conscious objective or desire for the primary actor to commit the crime").

To determine whether a defendant is a party to an offense, we may look to "events before, during, and after the commission of the offense." *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012) (quotations omitted). We may rely on circumstantial evidence to prove party status. *Beltran*, 472 S.W.3d at 290. "There must be sufficient evidence of an understanding and common design to commit the offense." *Gross*, 380 S.W.3d at 186. The mere presence of a person at the scene of a crime, or even flight from the scene, without more, is insufficient to support a conviction as a party. *Id.* Evidence is sufficient to convict under this theory "when the defendant is physically present at the commission of the offense and encourages its commission by acts, words, or other agreement." *Barrientos v. State*, 539 S.W.3d 482, 490 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (quotations omitted).

"To establish guilt under the law of parties, the evidence must show that, at the time of the offense, the parties were acting together, each contributing some part towards the execution of their common purpose." *Nelson v. State*, 405 S.W.3d 113,

9

123 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd); *see Gross v. State*, 352 S.W.3d 238, 243 (Tex. App.—Houston [14th Dist.] 2011) (stating that "'acting together' need not rise to the level of agreement," but parties "must be acting together to accomplish their common purpose"), *aff'd*, 380 S.W.3d 181 (Tex. Crim. App. 2012).

The jury charge also instructed the jury concerning the law of transferred intent. Under that doctrine, a person is criminally responsible for causing a result "if the only difference between what actually occurred and what he desired, contemplated, or risked" is that "a different person or property was injured, harmed, or otherwise affected." TEX. PENAL CODE § 6.04(b)(2); *Trevino v. State*, 228 S.W.3d 729, 737 (Tex. App.—Corpus Christi–Edinburg 2006, pet. ref'd) (op. on reh'g) ("Transferred intent is raised when there is evidence that a defendant, with the required culpable mental state, intends to injure or harm a specific person but injures or harms a different person or both."); *Chimney v. State*, 6 S.W.3d 681, 700 (Tex. App.—Waco 1999, pet. ref'd) (stating that under transferred intent doctrine, defendant can be held criminally responsible "for the death of another even if he did not intend to harm the victim so long as he caused the actual victim's death while acting with the intent to kill a different person").

*C.*     *Analysis*

On appeal, Watson does not argue that he was not present at the Corner Food Mart at the time of the shooting. Instead, he argues that because the State did not present any DNA, fingerprint, or gunshot residue evidence to substantiate its theory of his guilt, the evidence was insufficient to support the verdict. The State argues that notwithstanding the absence of these types of evidence, the circumstantial evidence was sufficient to establish Watson's guilt either as the principal actor or as a party. We agree with the State that sufficient evidence supports a conclusion that Watson and Harris were acting together when they fired gunshots in the direction of Partida and Joiner, killing Joiner.

Surveillance footage from the Corner Food Mart showed Harris arriving at the convenience store around midnight. Around 1:00 a.m., Harris witnessed the first fight between Partida and Nacosta, but he did not participate in this fight. Shortly after this fight, surveillance footage showed Harris placing a gun underneath the counter in the cashier's area of the store. He then spent time in the convenience store's game room, hanging out with others who were playing the gambling machines.

Approximately twenty minutes later, Watson arrived. Upon entering the store, he walked straight to the game room, where he started interacting with Harris and the others. Over the next half hour, Watson and Harris were frequently in each

other's company, walking around inside and outside the convenience store together and "cutting up" and "playing around" in the game room. At one point while he was in the game room, Watson took a gun out of his pocket.

While wandering around the convenience store, Watson spoke with Nacosta, who was inspecting the belongings stolen from Partida. Immediately after this, Watson removed a gun from his pocket and placed it underneath the counter in the cashier's area, near where Harris had placed his gun. Watson, Harris, and other store patrons continued walking in and around the store and the game room.

Around 2:00 a.m., both Watson and Harris left the store and stood outside. Nacosta was also outside, and he had Partida's belongings with him. Shortly thereafter, Partida returned to the convenience store. After having words with Nacosta, the two men fought a second time. This time, Harris also became involved in the fight. Watson was present during this fight, and surveillance footage shows him following the other men as they moved around the Corner Food Mart parking lot, but he did not attack Partida. Joiner arrived at the scene during this fight, although he did not appear to speak to anyone or get involved. Instead, he merely rolled his wheelchair down Crosstimbers before deciding to turn around and head back to the I-45 underpass.

This fight escalated beyond the mere throwing of punches, and the men did not stay in one place. Surveillance footage from both the Corner Food Mart and the

12

Shell station on the other side of Crosstimbers showed that Harris and Partida moved from the parking lot of the Corner Food Mart to the median of Crosstimbers to the parking lot of the Shell station, fighting the entire time. Ingrid Ramirez witnessed this fight and its progress across Crosstimbers from her vehicle, and she did not see any weapons drawn at this time. At one point during the fight, a car pulled up at the Shell station and briefly paused while the driver apparently spoke to Harris. Ramirez witnessed this and testified that it did not appear that the driver and Harris knew each other, noting that the driver was only present for "less than a couple seconds" before leaving the Shell station and eventually driving under I-45.

After the interaction with the car in the Shell parking lot, Harris and Watson both ran back to the Corner Food Mart. Partida also crossed Crosstimbers, but instead of walking to the convenience store, he walked several feet in front of Joiner towards the I-45 underpass. Surveillance footage showed that Watson ran inside the store first, followed by Harris. Both men retrieved the guns that they had placed underneath the counter in the cashier's area and then ran back outside. They both walked across the parking lot of the Corner Food Mart, heading toward the intersection of I-45 and Crosstimbers, before leaving the frame of the store's surveillance cameras.

The shooting itself was not clearly visible on the surveillance footage from the Corner Food Mart or from the Shell station. However, Ramirez witnessed two

13

men leave the fight, run to the Corner Food Mart, and return to the intersection carrying handguns. Ramirez was not able to identify either man, but she saw both men start shooting in the direction of Partida and Joiner, and she heard multiple gunshots. She did not see anyone else in the area with a weapon. Ramirez testified that she was "[a] hundred precent" sure that both men had guns and both men shot in the direction of Partida and Joiner. Joiner was shot in the back and died from the wound.

Watson and Harris were visible on surveillance footage as they returned to the Corner Food Mart following the shooting. Both men were holding guns when they re-appeared on the footage. Harris got into the backseat of the GMC Terrain and handed his gun to the driver, who passed the gun to a man standing outside the vehicle before driving away from the store. Watson walked into the store, still holding a gun. He left the store less than a minute later and walked down Crosstimbers, away from I-45. Watson returned to the store later that same day and asked the store's owner to delete the surveillance footage.[4]

---

[4] As the State points out, both flight from the scene and attempts to conceal incriminating evidence are circumstances of guilt that may be considered in a sufficiency analysis. *See Ex parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014) (noting that defendant's attempt to conceal complainant's body was "strong evidence" of his "consciousness of guilt"); *Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) ("Evidence of flight evinces a consciousness of guilt.").

During the ensuing investigation, police officers did not recover any firearms. They did, however, recover fourteen fired cartridge casings from the intersection of I-45 and Crosstimbers.[5] Specifically, they recovered nine 9-millimeter caliber casings and five .380 caliber casings. This indicated to the crime scene investigator that "there were possibly two different firearms" used. Investigators were not able to determine which weapon fired the fatal shot that killed Joiner because Joiner's gunshot wound was "perforating," meaning that the bullet passed through his body and was not recovered during the autopsy. The medical examiner could not determine the caliber of the bullet that struck Joiner based on the entrance wound alone.

We agree with the State that despite the lack of DNA, fingerprint, or gunshot residue evidence, the circumstantial evidence is sufficient such that a rational factfinder could have found the essential elements of the offense of murder beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Edwards*, 666 S.W.3d at 574; *see also Dunham*, 666 S.W.3d at 482 ("Direct evidence and circumstantial evidence are treated equally . . . ."). Even though investigators were unable to determine whether Watson fired the shot that killed Joiner, there is sufficient evidence that, at the least,

---

[5]    The homicide investigator testified that he did not request DNA or fingerprint testing of any of the fired cartridge casings because, in his experience, the heat created from the firing of the weapon alters the casing, and he has "never had a print come back."

he aided or attempted to aid Harris in committing the offense and was therefore criminally responsible for Harris's conduct under the law of parties. *See* TEX. PENAL CODE § 7.02(a)(2); *Barrientos*, 539 S.W.3d at 490 (stating that evidence is sufficient under law of parties "when the defendant is physically present at the commission of the offense and encourages its commission by acts, words, or other agreement"); *Cain v. State*, 976 S.W.2d 228, 234 (Tex. App.—San Antonio 1998, no pet.) ("Even where there is no evidence that the defendant fired the actual shots which killed, the law of parties may sustain a conviction for murder.").

Because a rational jury could have found that Watson and Harris were acting in concert when they left the fight, retrieved their guns from the Corner Food Mart, walked to the intersection of I-45 and Crosstimbers, and started shooting in the direction of Partida and Joiner, we hold that sufficient evidence supports the jury's guilty verdict. *See Cain*, 976 S.W.2d at 234; *see also Rodriguez v. State*, 629 S.W.3d 229, 234 (Tex. Crim. App. 2021) ("[P]ointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill.") (quotations omitted); *Rojas v. State*, 171 S.W.3d 442, 447 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (concluding that evidence supported inference that defendant knew that "shooting the gun in the general direction of a group of people" was reasonably certain to result in death).

We overrule Watson's sole issue on appeal.

16

**Conclusion**

We affirm the judgment of the trial court.


April L. Farris
Justice

Panel consists of Justices Hightower, Rivas-Molloy, and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).